UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| EZELL A. STARKS-BEY, | ) |
| | ) |
| Plaintiff. | ) |
| | ) |
| vs. | ) 1:86-CV-0928-JPG-DFH |
| | ) |
| BUREAU OF PRISON AND ITS | ) |
| OFFICER ERIC WHITE, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM**

This cause came before the Court on July 2-3, 2003 for trial on Plaintiff Ezell Starks-Bey's claim for constitutional tort against Defendant Eric White. Plaintiff alleged that Defendant administered cruel and unusual punishment against him by subjecting him to excessive force during a cell movement on September 16, 1985 and threatening additional force in the future. Defendant denied these allegations of Plaintiff's Amended Complaint. At the close of testimony on July 3, 2003, the Court allowed the record to remain open to allow Plaintiff to locate additional named eyewitnesses and present additional documentary evidence. On August 31, 2004, the Court received into evidence the deposition of William Temple taken July 14, 2004. At a conference on October 18, 2006, Plaintiff rested his case. Defendant moved for the entry of judgment pursuant to Fed.R.Civ.P. 52(c). Counsel have filed briefs supporting and opposing Defendant's Motion. Having considered

the testimony of the witnesses, the exhibits received at trial and the arguments of counsel, the Court now concludes that Defendant's motion should be granted and judgment entered for Defendant and against Plaintiff.

***Plaintiff's Claims***

As this case came to trial, the claims made in Plaintiff's Amended Complaint were essentially this. On September 16, 1985, while he was confined in disciplinary segregation at the United States Penitentiary at Terre Haute, Indiana, correctional officers, including Officer White, approached his cell with clubs, shields and tear gas guns to effect a so-called "shakedown," that is a removal of all personal property from his cell. As part of the "shakedown," unknown officers administered chemical mace against Plaintiff, threw him against a wall, forcibly restrained him and threw him from his cell to the range in front of his cell. At this point, Defendant White placed a knee on the back of Plaintiff, who was prone on the floor, and proceeded to cut his clothes from him with a pocket knife. During this procedure, White put his knife to Plaintiff's throat and stated to Plaintiff that should he continue to resist White would cut more than his clothes from him. Once his clothes were forcibly removed, Plaintiff was searched and forcibly moved to an isolation cell in the same cell block. In the process of cutting the clothes from Plaintiff, White cut Plaintiff on his left buttock.

Defendant White denies that on September 16, 1985, or any other

date, he assaulted Plaintiff as alleged and denies that he cut Plaintiff's clothes off him as alleged or cut Plaintiff himself.

### *Procedural History*

This case was filed by Plaintiff pro se on July 29, 1986. The case contained several allegations against several Defendants, both at Terre Haute and at the Bureau of Prisons Regional Office and at its national headquarters. Plaintiff's claims fell into two principal categories. One was a habeas corpus action alleging denial of due process in the imposition of prison discipline for an alleged assault instigated by Plaintiff. A related claim contended that as a result of the improperly imposed discipline parole was denied at a subsequent hearing. The second group of claims related to the claims of excessive force ultimately tried to this Court. Because of the admixture of habeas corpus and *Bivens* type claims and Plaintiff's frequent transfers throughout the federal prison system, action on the case moved slowly. On November 13, 1992, the Court, Judge Sarah Evans Barker, severed the habeas claims and transferred them to Plaintiff's then place of incarceration. The *Bivens* claims were stayed because of the interrelationship to the habeas corpus claims, and stayed to allow pursuit of Defendant's qualified immunity defense. The stay was extended by Judge McKinney on August 4, 1993. On September 26, 1995, Judge David F. Hamilton directed reports be filed on discovery remaining to ready the case for trial. Plaintiff's deposition was taken on June 21, 1996. A pre-trial conference was conducted on May 14, 1999. At that time, the parties

orally indicated a willingness to consent to trial to this United States Magistrate Judge. Written consents were filed and an order of reference issued June 17, 1999. Defendant's Motion to Dismiss for Failure to State a Claim was denied January 22, 2002. At a pre-trial conference on April 22, 2002 conducted by telephone, Plaintiff waived trial by jury. Defendant also waived a jury trial on April 29, 2002. Because of difficulty in securing pro bono counsel for Plaintiff, trial dates of August 6, 2002 and December 19, 2002 were vacated. A subsequent trial date of March 11, 2003 was continued on Defendant's motion. Counsel was appointed for Plaintiff on January 27, 2003. A final pre-trial conference was conducted June 17, 2003 and trial commenced July 2, 2003.

***Plaintiff's Witnesses***

In the period prior to trial, Plaintiff identified three eyewitnesses whom he wished to offer at trial. Beginning in November, 1988 Plaintiff identified his cell-mate, Charles Ferguson as an eyewitness to the events of September 16, 1985. Plaintiff's Contentions filed November 15, 1988. Ferguson was named along with Mario Bell, Johnny Coleman, and William Temple as witnesses for Plaintiff in a witness list filed November 15, 1988. Plaintiff followed this with a Motion to Subpoena Witnesses which named Ferguson, Bell, Temple and Coleman as witnesses to his Amended Complaint. This latter motion was filed July 5, 1990 but denied when the trial was continued. On August 7, 2000, Plaintiff renewed his Motion to Subpoena Witnesses naming Ferguson, Bell and Temple but deleting Coleman. The Court

granted this motion in part directing counsel for the Defendant to cooperate in locating any of these witnesses presently in federal custody.  Counsel for Defendant reported to the Court that Charles Ferguson had been released from federal custody; that Mario Bell was in custody at the United States Penitentiary Allenwood (PA); and that Temple was in custody at the United States Penitentiary Florence (CO).  On February 4, 2003, the Court appointed pro bono counsel for Plaintiff and directed him to inform the Court and opposing counsel of the names of Plaintiff's trial witnesses with a brief statement of their likely testimony.  On February 12, 2003, Plaintiff pro se filed his Notice of Proposed Witnesses, again naming Ferguson:  his then cell-mate; Mario Bell, confined in an adjacent cell; and William Temple, confined in a "near-by" cell.  Plaintiff's counsel, on February 28, 2003, filed a Report Regarding Proposed Witnesses naming Ferguson and Bell as eyewitnesses who would corroborate Plaintiff's account of the events of September 16, 1985.  Counsel in this report stated with reference to William Temple:

> "After careful consideration, Plaintiff does not believe that William Temple (prison#) would be able to offer evidence to assist the fact finder at trial because he was not near the scene of the events that underlie Plaintiff's claim."  Docket #587

At the final pre-trial conference on June 17, 2003, the Court denied Plaintiff's motion to require a deputy marshal to locate Ferguson and recommended counsel hire a private investigator for this purpose.  The Court also stated its intention to have the record open for a period of time to facilitate

the procurement of the testimony of Plaintiff's witness for consideration by the Court. Defendant's objection to this procedure was overruled.

When trial commenced, Plaintiff personally addressed the Court requesting a continuance of the trial to allow further efforts to locate witnesses. At this time, Plaintiff explicitly disclaimed interest in locating Charles Ferguson as a witness. (Tr. at 7-8)[1]. Plaintiff persisted in his request that Mario Bell be heard as a witness and, contrary to counsel's prior disclaimer, again named William Temple as an eyewitness. (Tr at 8). The motion to continue was denied.

After trial, Plaintiff's counsel engaged a private investigator to locate Bell and Temple. Only Temple was located. He was deposed on July 14, 2004 over the objection of Defendant's counsel, who informed the Court that Bureau of Prisons' records reflected that Mr. Temple was not in a cell on Plaintiff's unit until September 23, 1985 and was then confined in an isolation cell with limited visibility. The Court received the Temple deposition in evidence on August 31, 2004. Subsequently, Plaintiff rested, having informed the Court that efforts to locate Bell were futile. Defendant then filed this Motion.

### *Defendant's Rule 52(c) Motion*

Rule 52(c) empowers the Court, in a non-jury trial, after "a party

---

[1] Trial transcript references are identified by the citation Tr. with a page number following.

has been fully heard" to consider the claims or defenses of a party and adjudicate them on the merits adversely to the non-moving party if his claim cannot be sustained. In the Court's consideration of, in this case, Plaintiff's claim, the Court may weigh the evidence and is not required to accord any favorable inferences to the non-movant save those justified by the evidence. Further, the Court may consider the credibility of the witnesses in the course of its adjudication and resolve conflicts in the evidence. 9A. Charles Allen Wright and Arthur R. Miller, *Federal Practice and Procedure*, § 2573.1 (1995). In this case, since the only remaining evidence to be heard would have been rebuttal to the testimony of William Temple, the Court's consideration of the Defendant's motion is effectively the same as a decision at the completion of trial.

At the end of this long journey that has culminated in the trial of this case, the sole question that remains to be decided may be stated thus: Did this episode happen as Plaintiff alleges? After due consideration and deliberation, the answer is: No.

***Background and Undisputed Facts***

Plaintiff was a federal prisoner, serving sentences imposed both by the District of Columbia and by federal courts for offenses committed while in federal prisons. On May 31, 1985, a fellow inmate, Jessie Barnes, was assaulted and stabbed in the chest while in the stairway at unit 1-D. Plaintiff was alleged to have ordered the "hit" on Barnes. The incident was investigated

by prison authorities and the FBI. While the investigation went forward, Plaintiff was confined in administrative segregation. The FBI investigation ended with a decision not to prosecute and the assault was heard before the Institution Disciplinary Committee on August 30, 1985. The IDC concluded that Plaintiff was culpable and imposed sanctions of sixty-days disciplinary segregation, forfeiture of 442 days of statutory good time, and recommended the recision of parole and a transfer to a more secure institution. On August 31, 1985, Plaintiff was transferred to disciplinary segregation, unit I-East, and confined in cell #8 with Charles Ferguson.

After their arrival, a series of disturbances commenced on I-East. Trash, food and food trays were thrown onto the range by inmates. Toilets were stopped up with debris and cells were flooded with water. Plaintiff, among others, was identified as an instigator of these disturbances. For his part, Plaintiff alleges that the disturbances were a protest against prison authorities' treatment of inmate property, especially legal materials. In response to the disturbances, prison authorities restricted the amount and kind of personal property allowed to be kept in cells in I-East. Authorities also instituted sack or box lunches rather than food trays to limit the availability of trash and other objects to be thrown on the range. As part of these restrictions, a shakedown was conducted on the morning of September 16, 1985. A shakedown involves the temporary removal of prisoners from their cells and the search of the cell and removal of contraband or other property no

longer permitted.  It should be noted that the parties dispute whether the shakedown was conducted without incident in cell #8, or as Plaintiff contends he was assaulted and forcibly removed to an isolation cell during the shakedown.

It is undisputed that following the shakedown, complaints that Plaintiff was physically abused were made on his behalf.  He was examined by a physician's assistant on September 19, 1985, who found no evidence of abuse.  Later the same day, Plaintiff was photographed unclothed from the waist up.  These photographs were received in evidence as Exhibit 23.  It should be noted that the wound alleged by Plaintiff (to his left buttock) would be concealed in these photographs.  Plaintiff received a family visit on September 20, 1985.  This visit, Plaintiff contends, resulted from his family's concern for his safety and well-being.

On September 30, 1985, Plaintiff, his cell mate Ferguson and others were moved from their cells on the range in I-East to isolation cells at the rear of I-East.  Prison records reflect that Ferguson resisted movement and was forcibly moved following the administration of a chemical agent.  Prison records reflect that the other inmates moved that day, including Starks-Bey, were moved without incident.  Plaintiff's position on this is unclear as he contends his move took place on September 16, 1985.  However, Plaintiff does contend that when he was moved, he was also the victim of a chemical agent

9

and a forced move along with the alleged assault here at issue.

Plaintiff remained in the isolation cell until October 31, when at the conclusion of his sixty days of disciplinary segregation he was placed in administrative detention again to await transfer. He was transferred to Leavenworth Penitentiary on October 31, 1985. So far, as the records reflect, there were no incidents of consequence involving Plaintiff on I-East following September 30, 1985.

***Plaintiff's Version of Disputed Facts***

Plaintiff's testimony was that the assault against him occurred on September 16, 1985. He initially disclaimed any uncertainty about this date stating: "I can never forget that particular day in which I was attacked." (T.R. at 47). He testified that during the shakedown he was maced, forcibly removed from his cell, had his clothes cut from him by Defendant White and he was dragged to an isolation cell. He testified that Defendant cut him on the buttock while removing his clothes. He described that on arriving in the isolation cell he used its toilet as a communication device to contact other prisoners who were asked to inform his family of his predicament. He testified that he sought medical care, but it was refused. He stated that he was photographed but this was done in such a way as to conceal his cut. He testified that out of concern for his condition, members of his family made a visit to Terre Haute. He stated they were initially denied the opportunity to see him and he was reluctant to leave his cell for the visit, fearing additional violence. He was later transferred

to Leavenworth at the conclusion of his time in disciplinary segregation.

### *Discussion*

Most of the exhibits received in evidence at this trial were Bureau of Prisons records. The Bureau, not surprisingly, is a prodigious record keeper. Documenting its actions, counting its activities are among the ways bureaucracies make up for the absence of market forces in imposing accountability and justifying to some degree their existence. As a general rule the older a bureaucracy, that is to say, one that has long performed traditional governmental functions, the more sedulous the agency is in creating and keeping records and statistics. Additionally, the more an agency perceives the need for "posterior protection," the more records it creates and keeps. The latter is particularly true of law enforcement agencies.

Thus, the Bureau keeps elaborate records of the day to day activities of its prisoners: where they are, whether they eat, whether they shower, whether they exercise, whether they seek or receive medical attention, etc. The Bureau not only documents the mundane features of ordinary life, but it pays particular attention to events out of the ordinary, requiring reports from each participant to an incident involving, for example, the use of force. Therefore, not only are the records documenting events in prison significant but also the absence of records is also almost equally significant.

With these observations as background, we may state what the exhibits in this case reveal. Plaintiff was ***not*** moved from cell #8 to an isolation

11

cell on September 16, 1985.  Exhibit 6 reflects that he was in cell #8 for the following three days.  The daily log, Exhibit 26, reflects on page 49 that Plaintiff and his cell mate both housed in cell #8 refused their evening meal on September 18, 1985.  Another reference to Plaintiff as being in cell #8 between September 16, 1985 and September 30, 1985 can be found in Exhibit 26 at 51, referring to his family visit on September 20, 1985.  The exhibits also show that contrary to his testimony Plaintiff saw the physician's assistant on September 17, 1985.  He complained not about a cut or being maced but complained of a muscle pull while exercising.  Exhibit 25.  The exhibits also reflect an examination for signs of abuse or injury at the instance of the Correctional Lieutenant not at Plaintiff's request.  This exam was conducted September 19, 1985 and was completely normal.  Plaintiff was stated to have voiced no complaints.  Plaintiff did receive a family visit on September 20, 1985, but this occurred prior to any cell move and after the normal medical examination noted above.

The prison's records received in evidence detail the events of the shakedown of September 16, 1985.  Exhibit 16, a report from Lieutenant King to Captain Wolfe, states there were "no problems during shakedown."  After the shakedown, inmates are said to be noisy and verbally threatening without further action.  This version of events is corroborated in the log.  Ex. 26 at 47.  It is instructive to compare the records reflecting the cell move of Ferguson, Plaintiff's cell mate on September 30, 1985.  There the use of chemical agents

is documented and the forcible nature of the move detailed. Ex. 24. The log, reflects the difficulty in effecting the move of Ferguson. Ex. 26 at 60. Plaintiff Starks and another inmate were related to be moved "without incident."

Not only do the Bureau's records reflect that Plaintiff was not involved in any incident or even a move on September 16, they instead reflect that he was moved on September 30, 1985 peaceably though his cell mate required a forcible move with chemical agents.

A word is in order about the use of the Bureau records to disprove Plaintiff's allegations. Regrettably, as is well known, governments do lie at times. Similarly government employees also lie at times and have at times the means and the inducement to create false records or to alter records. But a careful fact finder has to look at the likelihood that such alteration or falsification has occurred. Several aspects of this case make such falsification highly unlikely. First, the records corroborate one another. Thus several records would have to be falsified to effect a cover-up. Secondly, the entries are made by a variety of individuals. The size of the conspiracy needed to alter records argues against it. The records are made contemporaneously long before any threat of suit or other investigation instituted by Plaintiff. The records appear to be in order with no evidence of alteration. They are also, so far as appears, complete without gaps. Finally, the incident involving the cell mate Ferguson is detailed at length, but the records reflect no other similar incidents involving Plaintiff (or anyone else) and expressly negate that

13

possibility. Under these circumstances reliance by the Court on these records where they contradict Plaintiff's testimony is justified.

Not only is Plaintiff's testimony contradicted by an elaborate set of prison records received in evidence at his trial, but Plaintiff's testimony is not credible in its own right. Plaintiff's testimony was subjected to vigorous and effective cross-examination. In the process, Plaintiff's certainty about an assault on September 16, 1985, wavered. By the end of cross-examination, there were up to three instances of forcible actions by the so-called special operations response team. T.R. at 87. Plaintiff admitted that the cell move to isolation could have occurred on September 16, 1985 or September 30, 1985. However, if the move occurred on the latter date then the Plaintiff's entire testimony involving his requests for help and medical care, the photographs taken of him and his family's visit, all of which are documented to have occurred before September 30, 1985, no longer fit his story of a series of responses to his assault. In short, Plaintiff's testimony simply breaks down.

Additionally, the testimony of Plaintiff's other witness does little to corroborate his testimony. Bureau of Prisons records provided the Court prior to trial show that Temple did not arrive on I-East until September 23, 1985, a week after Plaintiff's alleged assault. When he did arrive, he was placed in an isolation cell whose field of vision of the rest of the unit was limited. Temple's description of the assault has White remove the Plaintiff's clothing while Plaintiff stood contrary to Plaintiff's version of it cut from him while lying prone.

14

The testimony, under all the circumstances merits little weight.

Finally, the testimony of Defendant White is credible. His denials were as precise as they were firm. His version of events is corroborated by the records of the Bureau received as exhibits. The assertion made by Plaintiff that a senior correctional officer like White would not only carry an unauthorized weapon, with the potential for use against him, but use that weapon, a knife, in clear violation of prison policy is simply incredible. Further, White explained how one would remove clothing from a prisoner in restraints, a situation that does, no doubt, come up from time to time. His explanation was based on common sense and was believable. In resolving the several conflicts between the testimony of Plaintiff and Defendant, the Court finds Defendant's testimony more credible.

***Conclusion***

Having heard and considered all the testimony and documentary evidence, the Court concludes that the assault and excessive force alleged by Plaintiff in his amended complaint simply did not happen. There was no cutting of clothing from Plaintiff by White in September, 1985. There was no threat of future force made against Plaintiff. Excessive force was not applied against Plaintiff in September, 1985. What occurred was a normal cell move on September 30, 1985 ***and nothing more***.

Accordingly, Judgment will be entered for Defendant and against

Plaintiff.

DATED this ___ 16th day of February, 2007.

_____
JOHN P. GODICH, MAGISTRATE JUDGE
United States District Court
Southern District of Indiana

Copies to:

**Gerald A. Coraz**
UNITED STATES ATTORNEY'S OFFICE
gerald.coraz@usdoj.gov,jennifer.rivera2@usdoj.gov

**Adam Mathew Dulik**
BRATTAIN & MINNIX
adam.dulik@gmail.com

**Thomas E. Kieper**
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov,lin.montigney@usdoj.gov